## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Fabian Greyer, | |
| Plaintiff, | Case No. 3:20-cv-50014 |
| v. | Honorable Iain D. Johnston |
| Amber Allen et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Fabian Greyer, a former prisoner at Illinois' Dixon Correctional Center (Dixon), brings this action under 42 U.S.C. § 1983 against prison medical personnel, the corporation that employed them, and other prison officials, alleging that they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Before the Court are two motions for summary judgment: one by Wexford Health Sources and its employees (the Wexford defendants)[1] and the other by employees of the Illinois Department of Corrections (the IDOC

---

[1] In particular, he names Dr. Nancy Lank and nurse practitioners Kristina Mershon and Susan Tuell. Pl.'s Resp. Wexford Defs.' Statement Material Facts (PRWSOF) ¶¶ 2-4, at Dkt. 178. Wexford contracts with IDOC to provide medical services at Illinois prisons, including Dixon. Wexford Defs.' Reply to Pl.'s Additional Statement of Facts (WRPASOF) ¶¶ 11-12.

defendants).[2] For the following reasons, both motions are granted, and this action is dismissed with prejudice.[3]

## I. BACKGROUND

At all relevant times, Greyer was a prisoner at Dixon. Wexford Defs.' Reply to Pl.'s Additional Statement of Facts (WRPASOF) ¶ 1, at Dkt. 188. In October of 2017, he says he began to have pain on the right side of his body: in his neck, shoulder, hip, arm, leg, and foot. Pl.'s Resp. Wexford Defs.' Statement Material Facts (PRWSOF) ¶ 13, at Dkt. 178. The history of his treatment for these ailments, long and tortuous, follows.

### 1. Medical care

*i. June 14, 2018—Sick call nurse:* Prisoners at Dixon may use the sick call procedure to obtain medical care, whereby a nurse will evaluate their complaints and either treat them or refer them for further evaluation and treatment. PRWSOF ¶ 5. Greyer's first recorded complaint of the pain at issue in this case was when he was seen by a sick call nurse in mid-June of 2018. He complained of pain in his right hip down to the top of his right foot and rated it as a 10 on a scale for which that was the highest score. *Id.* ¶ 14. The nurse prescribed ibuprofen, told him to apply cold to the area, and instructed him to follow up if his pain increased. *Id.*

*ii. June 21, 2018—Sick call nurse*: A week later, Greyer again saw a sick call nurse, complaining of right hip and right leg pain—for which his ibuprofen didn't

---

[2] In particular, he names Amber Allen, the Health Care Unit administrator at Dixon, and Elizabeth White, a Dixon nurse. Pl.'s Resp. IDOC Defs.' Statement of Material Facts (PRISOF) ¶¶ 2-3, at Dkt. 179.

[3] The Court thanks Mr. Greyer's assigned counsel for his assistance with this case.

"work[]"—and which he again rated as a 10, the highest score; the nurse, however, noted no signs of obvious discomfort. *Id.* ¶ 15. The nurse gave him Tylenol and referred him to a nurse practitioner. *Id.*

*iii. June 26, 2018—Tuell:* Greyer was then seen for the first time by nurse practitioner Susan Tuell and complained of right hip and foot pain for "some time." *Id.* ¶ 16. Tuell examined him, found him in no visible distress, and continued his prescriptions, finding that he likely had degenerative joint disease (that is, arthritis). *Id.* ¶ 17.

*iv. August 10, 2018—Sick call nurse:* Greyer returned to sick call and reported pain in his right hip down to his foot, which he again rated as a 10. *Id.* ¶ 18. The nurse noted no signs of visible discomfort; she also found that he was receiving Tylenol but refused to take his prescribed ibuprofen. *Id.* He was again referred to a nurse practitioner. *Id.*

*v. August 15, 2018—Mershon:* That referral led to Greyer's first appointment with nurse practitioner Kristina Mershon, where Greyer complained of right hip pain for which his Tylenol did not give effective relief. *Id.* ¶ 19. Mershon noted that his vital signs were normal; that he showed no visible signs of distress; that he was slow in sitting and standing; and that his gait was steady but slow. *Id.* ¶ 19-20. She concluded that his presentation was consistent with arthritis, and prescribed naproxen, another nonsteroidal anti-inflammatory drug (NSAID) commonly used to treat it, in addition to his Tylenol prescription. *Id.* ¶ 21. She also ordered an x-ray of Greyer's hip and scheduled another appointment. *Id.* ¶ 21.

*vi. August 23, 2018—Mershon:* Mershon told Greyer that the x-ray confirmed a diagnosis of arthritis. *Id.* ¶¶ 22-23. He complained that his naproxen was ineffective. *Id.* ¶ 23. In response, she discontinued his Tylenol and prescribed Tylenol with codeine, a stronger, opioid medication, but continued the naproxen because she thought that its anti-inflammatory properties might still help Greyer. *Id.* ¶ 24.

*vii. September 24, 2018—Mershon:* Mershon next saw Greyer for a follow-up about his hip pain. *Id.* ¶ 25. Greyer agreed with his treatment plan, offered no new concerns, and reported that his regimen of pain medications was working. *Id.* Mershon says she continued his Tylenol with codeine prescription because of Greyer's report that it was effective and told him to follow up if necessary. *Id.*

*viii. October 24, 2018—Mershon:* Greyer requested that Mershon renew his prescription for Tylenol with codeine, which she did; she says this led her to believe that it was working. *Id.* ¶ 26.

*ix. February 6, 2019—Sick call nurse*: After nearly four months, Greyer again returned to sick call to complain of right hip pain, which he rated as a 10 in severity. *Id.* ¶ 27. The nurse referred him to see a nurse practitioner, and he refused the nurse's offer of a crutch to help in walking. *Id.*

*x. February 11, 2019—Mershon:* At this appointment, Greyer again complained of right hip pain. *Id.* ¶ 28. A physical exam revealed a slight limp. *Id.* ¶ 29, 33. In response to his complaints that his medication was ineffective, and noting his diagnosis of arthritis, Mershon prescribed Prednisone, a steroid

4

commonly used to treat arthritic pain, and referred him to a doctor to evaluate his prescription regimen and diagnosis. *Id.* ¶ 30-33.

*xi. February 21, 2019—Lank:* At his first appointment with Dr. Nancy Lank, Greyer reported, for the first time, right shoulder and right arm pain in addition to his right hip pain. *Id.* ¶ 34. He reported that his Tylenol with codeine was "not helping." *Id.* An exam of Greyer's neck showed a decrease in extension but was otherwise normal; an exam of his hip showed some decreased flexion and extension. *Id.* ¶ 35. Lank diagnosed Greyer with a possible neck sprain, a right shoulder sprain, and arthritis in his right hip. *Id.* ¶ 36. She ordered an x-ray of Greyer's spine and discontinued his Tylenol with codeine; this was replaced by a course of another opioid (Tramadol), another NSAID (Mobic), and a muscle relaxant (Robaxin). *Id.*

*xii. March 7, 2019—Lank:* At this appointment, Lank discussed Greyer's x-ray, which showed some arthritis in his neck. *Id.* ¶ 38. Greyer again reported pain in his right hip down through his right leg, and in his right neck down through the right arm and elbow. *Id.* ¶ 37. There is no evidence that Greyer complained of any weakness or loss of function. *Id.* ¶ 38. He did, however, complain of hearing voices (which she noted he was already taking medication for, Dkt. 165 Ex. D, at 58) that told him to kill himself to stop the pain, but he did not exhibit any signs that he had a plan to harm himself. PRWSOF ¶ 39. Lank referred him to a nurse practitioner who specialized in mental health treatment to address these issues. *Id.* She also prescribed an egg crate mattress (for comfort), Vitamin D3 (which improves calcium

uptake and can reduce the inflammation and bone loss associated with arthritis), muscle rub, ice, and hot packs. *Id.*

*xiii. March 15, 2019—Lank:* During a follow-up, Greyer reported chronic pain that was worse with movement in his right arm, neck, and shoulder. *Id.* ¶ 40. He did not complain of hip pain at this appointment, nor did he report any weakness or loss of reflexes or function. *Id.* ¶ 40-41. An exam revealed no loss of function in the shoulder, and Greyer was in no visible distress. His medications were continued. *Id.* ¶ 42.

*xiv. March 21, 2019—Tuell:* Greyer was next seen by Tuell at a chronic care clinic for his hypertension; he was not in outward distress, and he did not complain to her about any pain. *Id.* ¶ 43. He asked that his Tylenol with codeine prescription be discontinued. *Id.*

*xv. March 25, 2019—White:* Greyer returned to sick call—for the third time that month, *see* IDOC Defs.' Resp. Pl.'s Additional Statement of Fact (IRPASOF) ¶ 25, at Dkt. 193—to complain of severe pain in his right shoulder, arm, and neck (but not his hip). *Id.* ¶ 23. He was seen by nurse Elizabeth White, who observed no visible signs of discomfort; under IDOC's "nonspecific discomfort" treatment protocol, she prescribed Tylenol and told him to return if his symptoms worsened but did not refer him to a physician. Greyer claims that he disagreed with this decision not to refer him, when IDOC policy requires that a referral be made when an inmate comes to sick call with the same complaint more than twice in a month. *Id.* ¶ 23-25.

*xvi. March 27, 2019—White:* Greyer returned to sick call with the same complaints as March 25. *Id.* ¶ 26. White told him to finish his Tylenol regimen before returning to sick call. She claims he agreed to this plan, while he says he did not and insisted that he be referred to a doctor, which White refused to do. *Id.* ¶ 26.

*xvii. March 30, 2019—Sick call nurse*: Greyer returned to the sick call unit and was referred by another nurse to see a doctor. PRISOF ¶ 19.

*xviii. April 5, 2019—Lank:* Greyer saw Lank again, complaining of neck and shoulder pain, but did not complain about his right hip (although he did report that his legs hurt when he walked). PRWSOF ¶¶ 46-47. Lank found that he likely suffered from multiple joint arthritis and prescribed Voltaren (a stronger NSAID than Mobic, commonly used to treat arthritis) and planned to restart his Tramadol and Robaxin prescriptions while discontinuing his use of ibuprofen and naproxen. *Id.* ¶¶ 47-48.

*xix. June 10, 2019—Tuell:* Because his Tramadol prescription was set to expire, Tuell renewed his Tylenol prescription in advance of an upcoming appointment where she planned to discuss his regimen of medications. *Id.* ¶¶ 50-51. Tuell noted that Greyer was not taking his Tramadol, Robaxin, or Tylenol as scheduled.[4]

---

[4] Greyer attempts to dispute this. He argues that in her deposition, Tuell testified that she was "not totally familiar" with how the nurses wrote the dispensing notes in Greyer's Medication Administration Record (MAR), which describe the date, time, and dose of each medication dispensed. PRWSOF ¶¶ 50-51. But that applied only to a subset of notations on the MAR. She testified, uncontradicted, that dates marked with empty circles were "definitely" times that Greyer refused to take his medication—of which there were "lots"— and that while she was not certain of the meaning of circled dates with signatures inside,

*xx. June 18, 2019—Tuell:* Tuell saw Greyer for a complaint of constipation. *Id.* ¶ 52. He did not complain of any right-sided pain, was in no apparent distress, and did not ask for any alteration to his regimen of pain medication. *Id.*

*xxi. July 13, 2019—Sick call nurse:* Greyer requested a renewal of his prescription Robaxin but reported that his right side continued to hurt. *Id.* ¶ 53.

*xxii. September 25, 2019—Tuell*: Tuell next saw Greyer at a chronic care clinic, where he was in no visible distress. There is no evidence that he complained of foot or leg pain. *Id.* ¶ 54. Although Tuell noted that Greyer took his morning medications, which were brought to him in his housing unit, he did not appear to take his afternoon medications. *Id.*[5]

*xxiii. November 26, 2019—Tuell*: At this appointment, regarding Greyer's preexisting anemia, he asked for additional pain medication; Tuell prescribed him Robaxin again. *Id.* ¶ 55.

*xxiv. March 13, 2020—Mershon*: Mershon next saw Greyer at a chronic care clinic for his hypertension and gastroesophageal reflux disease (GERD); there is no evidence Greyer raised any concerns about pain, and his medications were renewed. *Id.* ¶ 56-57.

*xxv. August 7, 2020—Mershon*: Mershon saw Greyer for a routine physical. She noted that his extremities had a full range of motion, that they were strong and equal bilaterally, and that he had an upright and steady gait. *Id.* ¶ 58. There is no

---

they were probably also dates he refused to take his medication. Dkt. 164 Ex. C, at 24. So it is undisputed that he did not take his medication at least some of the time.
[5] See note 4.

evidence that he raised any concerns about his chronic pain problem at this appointment. *Id.*

    *xxvi. September 9, 2020—Mershon*: At another clinic visit for his chronic issues, Mershon noted that he was in no visible distress, and there is no evidence that he offered any concerns about his chronic pain problem. *Id.* ¶ 59. His medication regimen at this point consisted only of Tylenol and Robaxin. *Id.* ¶ 60.

    *xxvii. December 2, 2020—Mershon*: Greyer's complaints of right-sided pain reemerged at this appointment; he reported pain in his right hip, shoulder, and leg. *Id.* ¶ 61. He also reported spending much of his time lying in bed, during a time when IDOC implemented policies that restricted the inmates' movement to combat the spread of COVID-19, confining them to their cells for much of the day. *Id.* ¶ 61. Greyer denied experiencing severe pain. *Id.* ¶ 61. A physical exam showed nothing of concern, so Mershon prescribed naproxen and counseled him to find activities other than lying in bed and to change positions frequently when he did. *Id.* ¶ 62.

    *xxviii. February 12, 2021—Sick call nurse:* At sick call, Greyer requested that his Robaxin prescription be discontinued. *Id.* ¶ 63.

    *xxix. August 26, 2021—Tuell:* In the weeks leading up to this appointment, Greyer had complained of rectal bleeding and had labs done to investigate that complaint; to follow up on the results of that testing, Tuell saw him at this appointment. *Id.* ¶ 64. Greyer renewed his complaints of pain, reporting that his "entire body hurt" and that Tylenol and naproxen were "not controlling" his pain. *Id.* Tuell discussed the possibility of restarting a regimen of Tramadol or Tylenol

with codeine, but Greyer rebuffed those suggestion, replying that he only wanted Norco, a narcotic, which he heard was stronger than the medication he was taking. *Id.*; WRPASOF ¶ 37. Tuell told him that she was unable to prescribe such a medication and referred him to see a doctor, both for his request for Norco and for a consultation with a gastroenterologist. PRWSOF ¶ 64.

*xxx. September 1, 2021—Sy:* On Tuell's referral, Greyer was seen by another physician, Dr. Sy. *Id.* ¶ 66. Greyer reported pain "all over," from head to toe, in the prior two months, and in his neck, shoulders, and hip in particular. *Id.* He told Sy that he had previously taken Tramadol and Tylenol with codeine but that they "did not work" and that he had taken Robaxin and was content with that medication until it began to be delivered in a crushed form, at which time he stopped taking it because of its "nasty" taste. *Id.* ¶ 66. Sy's physical exam revealed nothing noteworthy, and he prescribed Baclofen but ordered no further testing. *See id.* ¶ 67.

*xxxi. September 5, 2021—Mershon:* Greyer was next seen by Mershon at another chronic care clinic related to his hypertension and GERD. *Id.* ¶ 68. He denied having any other concerns and was not in visible distress. *Id.*

*xxxii. February 17, 2022—Mershon:* Finally, at a chronic care clinic for his hypertension and GERD, Greyer did not report any concerns to Mershon and was not in visible distress. *Id.* ¶ 69.

**2. Grievances**

*i. March 27, 2019*: Greyer submitted a grievance about his treatment by nurse White and others at sick call, describing how they refused to see him for his

10

pain and told him to take medications that he had been prescribed before and therefore believed to be ineffective. Greyer Decl. Ex. A Ex. 3 at 13, at Dkt. 177. He requested to be sent to an outside hospital. *Id.*

*ii. July 25, 2019:* Greyer submitted another grievance, detailing how he had allegedly made three requests to go to sick call over the previous two weeks but had not been seen, and continued to suffer right-sided pain that caused him to have suicidal thoughts. Greyer Decl. Ex. A Ex. 1 at 13, at Dkt. 177. He also complained about not having received a response to his first grievance, and again requested to be sent to an outside hospital. *Id.* at 8-9.

## II. LEGAL STANDARD

A party is entitled to summary judgment when it demonstrates that there is no genuine dispute as to any material fact and judgment is proper as a matter of law. Fed R. Civ. P. 56. A fact is material when it could affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), and a dispute is genuine when it could lead a reasonable jury to return a verdict in favor of the non-moving party. *Id.* The Court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences—but not every conceivable inference, *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987)—in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Smith v. Crounse Corp.*, 72 F.4th 799, 804 (7th Cir. 2023).

## III. ANALYSIS

### A. Section 1983

42 U.S.C. § 1983 provides a claim against any person who, under color of a state's "statute, ordinance, regulation, custom, or usage" deprives any person of a right secured by the federal Constitution. 42 U.S.C. § 1983. Liability must be based on each defendant's knowledge and actions, *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012); *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009), which may include either direct participation in the "offending act," acting or failing to act with reckless disregard of someone's constitutional rights when under a duty to safeguard them, or allowing an offending act to occur with one's knowledge or consent. *Childress v. Walker*, 787 F.3d 433, 439-40 (7th Cir. 2015).

### B. Deliberate indifference under the Eighth Amendment

The Eighth Amendment prohibits deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A plaintiff must show evidence of a serious medical need, and that the defendant was subjectively aware of the specific, serious medical need or risk but disregarded it by "failing to take reasonable measures to abate it" to make out a claim of deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834, 847 (1994).

#### 1. Objectively serious medical need

The medical need at issue must be objectively serious, which has been glossed to include (1) conditions that could result in further injury or unnecessary and wanton infliction of pain if not treated; (2) injuries that a reasonable doctor or

12

patient would find important and worthy of comment or treatment; (3) conditions that significantly affect an individual's daily activities; or (4) conditions that produces chronic and substantial pain. *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008).

### 2. Deliberate indifference

A prison official can act with deliberate indifference only when he "*actually* [knows] of a substantial risk of harm." *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022). This requires an inquiry into his subjective state of mind; objective recklessness is not sufficient. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016); *Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot . . . be condemned as the infliction of punishment.").

Mere medical malpractice does not constitute deliberate indifference. *Estelle*, 429 U.S. at 106. Deliberate indifference is a demanding standard "because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022). It does not, however, require being ignored, for the provision of medical treatment can also constitute deliberate indifference if its risks were obvious—then, it becomes reasonable to infer that the prison official knew of the risk yet disregarded it. *Petties*, 836 F.3d at 729.

When a medical professional claims that the treatment he rendered issued from his medical judgment, that claim is owed deference as an assertion that he lacked a culpable mental state. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). Yet deference to a claim of medical judgment may be overcome by evidence—direct or circumstantial—that the medical professional did not honestly believe his own explanation, including by his persistence in a course of treatment known to be ineffective, or by a departure from the standard of care so radical that one may infer that he did not exercise professional judgment at all. *Id.* at 805 (7th Cir. 2016); *Thomas v. Martija*, 991 F.3d 763, 768 (7th Cir. 2021).

**C. Greyer's objectively serious medical condition**

As a threshold matter, Greyer must show that he suffered from an objectively serious medical condition. He argues that his chronic pain itself qualifies. Pl.'s Reps. Opp. Defs.' Mot. Summ. J. (PROW) at 12-13, at Dkt. 176.

**1. Pain as a serious medical condition**

Pain can constitute an objectively serious medical condition in the absence of attendant objective signs. Deliberate indifference toward "prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim." *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012). "Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition." *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996).

**2. Factual support**

Greyer cites his repeated complaints of "10/10" pain; the pain's alleged interference with his daily tasks and his job as a janitor at Dixon, WRPASOF ¶ 3; the suicidal ideations that the pain allegedly provoked; and the very fact that the Wexford defendants prescribed opioids and other strong medications, something they would have only deemed necessary if they themselves had credited his claims that he was in substantial pain. *id.* ¶ 10. PROW at 12-13.

Disagreeing, the defendants point to facts that tend to undermine Greyer's subjective complaints of excruciating pain: that they were always belied by his normal physical exams and lack of outward distress; that he routinely failed to take his pain medications; that he never appeared unable to perform daily tasks; and that there is no evidence regarding Greyer's post-incarceration treatment, or a confirmation of Greyer's urged diagnosis of radiculopathy. Wexford Defs.' Rep. (WDR) at 2-4, at Dkt. 187.

### 3. Conclusion

Even when the only evidence for a party's position is "self-serving," so long as it is based on personal experience, it is sufficient to defeat a motion for summary judgment. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) And pain, after all, is the "textbook example of a uniquely subjective experience." *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996). Thus, Greyer's claims of pain create a genuine dispute of material fact as to whether his condition was objectively serious, and there is enough evidence for this element of his claim to survive summary judgment.

### D. Wexford defendants' alleged deliberate indifference

15

For his claims as a whole to survive, however, Greyer must also show that there are genuine disputes of material fact as to the deliberate indifference element of his claims as to each of the Wexford defendants. He has failed to do so—and because no reasonable jury could find in his favor, summary judgment is granted for all the Wexford defendants.

### 1. Theories of deliberate indifference

Greyer urges the Court to consider Greyer's care "in its totality." PROW at 1-2; *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). But that injunction does not excuse the requirement that under § 1983 liability can only be individual. And insofar as care should be considered in its totality, showing deliberate indifference through a pattern of allegedly negligent acts "entails a heavy burden," and is usually insufficiently probative to allow the inference that the defendants were deliberately indifferent. *See Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999).

Greyer claims that the Wexford defendants were deliberately indifferent because they knew of his serious medical need yet failed to provide "basic and necessary" medical evaluations, instead opting for easier and less efficacious treatment and persisting in a course of ineffective treatment. PROW at 14.

Greyer argues—without proper attention to each defendant's knowledge and actions considered individually—that there is sufficient evidence to conclude that the Wexford defendants "knew of [Greyer's] severe chronic pain," PROW at 15, and thus their allegedly defective responses amount to deliberate indifference. True, the

defendants certainly knew of Greyer's complaints of chronic pain. By itself, however, this is not enough: Greyer must show that each defendant was (1) subjectively aware of his objectively serious medical condition *and* (2) subjectively aware that their conduct involved a high risk of harm (3) but nevertheless did not take reasonable measures to abate it.

So, under Greyer's two theories of deliberate indifference to his chronic pain, he must show either that each Wexford defendant (1) was subjectively aware that there was a high risk that her chosen course of treatment would not abate his pain yet failed to act reasonably so as to abate it (his theory of a course of ineffective treatment) or (2) that each Wexford defendant was subjectively aware of a high risk that the diagnosis of arthritis was wrong, and that her treatment of his pain would consequently not abate the pain, but nevertheless persisted in treating him as if he had arthritis and refused to investigate the possibility he had another condition or to treat him for it (his theory of opting for easier and less efficacious treatment).[6] Neither theory can survive summary judgment.

### 2. Tuell

#### a. Tuell's treatment of Greyer

Tuell claims all her decisions regarding Greyer's care were based on her medical judgment. PRWSOF ¶ 70. That claim is entitled to deference unless Greyer

---

[6] Analytically, it makes sense to separate the theories based on the different risks the defendants might have appreciated: (1) that the treatment would be ineffective, contingent on a diagnosis of arthritis; or (2) that the diagnosis was wrong, and thus the treatment would be ineffective for that reason.

can produce enough evidence to raise the inference that it is pretextual and that she instead possessed a culpable, reckless mental state. *Zaya*, 836 F.3d at 805.

Tuell saw Greyer six times. At the first appointment on June 26, 2018, in light of his complaints to the sick call nurses and to her about right hip and leg pain, Tuell prescribed him Tylenol. PRWSOF ¶¶ 16-17. His physical exam was normal, and she found it was likely he suffered from arthritis. *Id.*

At his next three appointments with Tuell—March 21, 2019; June 18, 2019; and September 25, 2019—there is no evidence that Greyer complained of any pain, and he was not in any visible distress. *Id.* ¶¶ 43, 52, 54. If she had examined his intervening medical records, she would have seen that her initial diagnosis of arthritis had been confirmed by an x-ray and that both Lank and Mershon had treated him according to that diagnosis. *Id.* ¶¶ 22-23, 35-38. Before the first and between the first and the second of these appointments, Greyer saw Lank; at neither of those appointments did he complain of any pain, and his medications were adjusted by Lank in response to his complaints. *Id.* ¶¶ 35-38. At the March appointment with Tuell, he asked that his Tylenol with codeine prescription be discontinued. *Id.* ¶ 43. In advance of the June appointment, Tuell renewed his Tylenol prescription, which she says was because she planned to talk to him at his next appointment about his pain medication regimen, because his Tramadol was about to expire and his records showed that he was not taking his medications as he

should have. *Id.* ¶¶ 50-51.[7] At the September appointment, Tuell again noted that Greyer was not taking his pain medications as often as prescribed. *Id.* ¶ 54.

At his final two appointments with Tuell—November 26, 2019, and August 26, 2021—he complained about pain, but again was not in any visible distress. *Id.* ¶¶ 55, 64. At the first of these, he asked for more pain medication, and she re-prescribed Robaxin, *id.* ¶ 55; at the second, more than a year and a half later, he complained of continued pain for the first time in 2021, reporting that Tylenol and naproxen were "not controlling" it. *Id.* ¶ 64. In response, she referred him to a doctor. *Id.*

### b. Persistence in a course of treatment known to be ineffective

Greyer argues that Tuell persisted in an ineffective course of treatment based on her conduct during two periods.

During the first period, from July 2019 to November 2020, he complained of continuing pain, noted that his medications were not working, and asked to be referred to an outside provider. PROW at 24-25. He claims that Tuell knew his treatment was ineffective based on three classes of evidence. First, a grievance of July 2019 asking to be seen by a doctor outside of the prison; second, a sick call slip of the same month in which he reported that his right side hurt, *id.* at 23-24; and third, medical notes showing that he had complained that his medication was ineffective, including June 14, 2018, when he told the sick call nurse that his ibuprofen was ineffective; August 17, 2018, when he reported to Mershon that his

---

[7] See note 4.

naproxen was ineffective; February 11, 2019, when he told Mershon that his pain was being ineffectively managed by his regimen; and February 21, 2019, when he told Lank that his Tylenol with codeine was not helping. *Id.* at 17. Tuell saw him twice during this period—September 25, 2019, and November 26, 2019—and he complains that his medications went unchanged in spite of his complaints. *Id.* at 24.

He also argues that his treatment between March 2021 and August 2021 involved deliberate indifference. In this period, Tuell only saw him on August 26, 2021. In response to his complaints of continuing pain, she offered a prescription of Tramadol and Tylenol with codeine, but he refused, insisting that he wanted only Norco. He argues that despite "years of evidence" that "oral pain medications" were "ineffective at treating [his] pain", Tuell represcribed them anyway, which constituted deliberate indifference. *Id.* at 25.

As to Tuell's knowledge of his continued pain or the purported ineffectiveness of his medications, Greyer offers no reason to think that she or any of the Wexford defendants would have known of the contents of his grievances, PRWSOF ¶ 75, and she says that she never saw the sick call slip, which Greyer offers no reason to doubt. Tuell Dep. Tr. Ex. C at 35, at Dkt 164. And he points to nothing in particular to show that Tuell knew that "oral pain medications" as a class were ineffective during the second period. Because the undisputed evidence cannot show that Tuell knew the full scope of Greyer's medical treatment (even if a failure to do so were negligent in itself, *see Farmer v. Brennan*, 511 U.S. 825, 837 (1994)), and there is no

evidence that her treatment was radically defective in treating Greyer as he presented to her, his claim fails here.

Even if it were assumed that Tuell knew of every occasion on which Greyer reported that his pain continued, his medication was ineffective, or that he was allegedly forced to quit his janitorial job because of the pain—which he offers no reason to believe—Greyer's claim still fails.

First, as the parties agree, arthritis is a degenerative condition—that is, one that will involve "deterioration" and a "worsening of . . . physical . . . qualities" over time, Stedman's Medical Dictionary 232730—and treatment for it focuses on "minimizing" the patient's pain. PRWSOF ¶ 10. "[T]o say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). When the condition complained of is itself pain, especially when related to a degenerative condition, and the treatment is otherwise appropriate, the bar for showing deliberate indifference by a course of ineffective treatment cannot be surmounted by showing that the prisoner continued to be in pain, as pain is never likely to be wholly eliminated. Thus, the mere fact that Greyer continued to report pain would not plausibly raise the inference in Tuell's mind, or that of anyone else, that the treatment was ineffective, but at most that a treatment that was previously effective was no longer so.[8]

---

[8] And even when he complained of pain, his last documented complaint of *severe* pain ("10/10") was March 25, 2019. IRPASOF ¶ 23.

And none of Greyer's other evidence supports such an inference either. His expert does not assert that the treatment Tuell administered, contingent on a diagnosis of arthritis, fell below the standard of care. PRWSOF ¶ 11.

That his medications remained unchanged during the first period is irrelevant as to the September 25, 2019 appointment, because he did not complain of any pain, *id.* ¶ 54, and not true as to the November 26, 2019 appointment, when Tuell represcribed Robaxin, *id.* ¶ 55.

And as to the second period, the evidence supporting the inference that Tuell knew that a course of Tylenol with codeine or Tramadol would be ineffective is only described as "years of evidence"; but a course of only Tylenol with codeine had apparently given him prolonged periods of relief, *see id.* ¶¶ 22-26, and the notion that Tuell knew that "oral pain medications" would be ineffective is belied both by the lack of any evidence that this is a relevant and medically meaningful category, and by the fact that Greyer had failed to report any pain for long stretches of time on different courses of such medications.

Nor was it obvious that his treatment was ineffective, because any alleged objective signs were confounded by Greyer's other conditions. His outward demeanor, physical exams, and vital signs never suggested that he was in pain, and he was seemingly able to carry out the functions of daily life. PRWSOF ¶ 13, 70. The only objective sign Greyer can point to is a high blood pressure reading during his March 7, 2021 appointment with Lank—because he had a history of hypertension and was regularly seen for it, however, that hardly would have raised

22

the inference that he was therefore in severe pain. WRPASOF ¶ 21. Likewise, even if Tuell knew of Greyer's claims that he suffered suicidal ideations because of his chronic pain, she would also have seen in the same medical records that this was a preexisting condition for which he was taking medication. PRWSOF ¶ 39.

Because Greyer's allegedly serious medical condition was wholly subjective, Tuell cannot have been deliberately indifferent for failing to alter his course of treatment when he failed to complain of any pain and failed to take his medications—or even requested that his pain medication be reduced. *Id.* ¶ 43. And those times that Greyer did complain of pain, no reasonable jury could find that Tuell's responses amounted to deliberate indifference—at the November 26, 2019 appointment, she gave him a new prescription of Robaxin; at the August 26, 2021 appointment, she attempted to prescribe two opioids that she had reason to believe had previously been effective. When he refused, she referred him to a doctor for a second opinion, which certainly does not evince a "total unconcern for the prisoner's welfare." *Rasho*, 22 F.4th at 710. A diagnosis of arthritis had been objectively confirmed, and for that diagnosis, she treated him appropriately. There is thus no deliberate indifference on this theory.

### c. Choosing an easier and less efficacious treatment

As to the second theory, Greyer joins the evidence buttressing the first theory—which allegedly shows that the diagnosis of arthritis was obviously wrong or incomplete because he continued to complain of pain—with expert testimony that Tuell fell radically below the standard of care by failing to recognize that the

arthritis diagnosis did not account for the "totality and severity" of Greyer's pain, on the basis of medical records of June 14, 2018, August 10, 2018, and February 6, 2019, which indicate that Greyer complained of radiating pain, as well as his positive response to Prednisone. PROW at 17-18. The expert says that this should have indicated to Tuell that Greyer was suffering from radiculopathy. Had Greyer had additional tests (which could have confirmed a diagnosis of radiculopathy) or been referred to a specialist, he might have benefitted from more "effective . . . interventions and treatments." PROW at 16. Tuell is further faulted for failing to adhere to the Wexford guidelines for chronic pain, which suggest that the etiology of chronic pain should be reevaluated if a course of treatment does not resolve the pain within 90 days, WRPASOF ¶ 14, and yet she never sent him for further evaluations. PROW at 18.

On this evidence, Greyer submits that Tuell was deliberately indifferent in choosing an easier and less efficacious course of treatment. He argues that she was conscious of the risk that he suffered from another condition for which another course of treatment was required, and that this can be inferred from falling below the standard of care and failing to abide by the Wexford guidelines, as well as the obviousness of the fact that his medications were ineffective (and thus that he had another condition).

For her part, Tuell says that his presentation never indicated radiculopathy or any condition beside arthritis, that further testing or referral to a specialist were never warranted, and that her decisions were all made using her medical judgment.

24

PRWSOF ¶¶ 74,79. Again, that claim is entitled to deference unless Greyer can make a strong showing to the contrary.

As a preliminary matter, an expert's claim that someone fell below the standard of care is, at best, only "weakly probative" of that person's state of mind, because "doctors do sometimes act unreasonably," so by itself "an expert's assessment that a treatment decision was unreasonable" is not enough to raise the inference of recklessness. *Zaya*, 836 F.3d at 807.

This is especially true with respect to claims of deliberate indifference concerning an allegedly incorrect diagnosis. When there is

> no evidence that the inmate's symptoms were consistent only with a single diagnosis, and where there is no evidence that the doctor was ignoring the inmate's needs, it is not enough to show that a reasonable doctor would have made the correct diagnosis and treatment. "If the symptoms plainly called for a particular medical treatment—the leg is broken, so it must be set; the person is not breathing so CPR must be administered—a doctor's deliberate decision not to furnish the treatment might be actionable under § 1983." A doctor might be careless in not appreciating the need to investigate several possible explanations for a particular prisoner's symptoms, and this carelessness may constitute malpractice. But malpractice alone is not enough to meet the constitutional standard.

*Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000) (cleaned up) (quoting *Steele v. Choi*, 82 F.3d 175, 179 (1996)).

Greyer's expert claims that Tuell failed to provide "standard or even basic medical care" in response to Greyer's complaints of chronic pain by her failure to order diagnostic testing in light of the possibility that he suffered from radiculopathy. PROW at 20. But the basis for that opinion is merely that Greyer's occasional reports of radiating pain were "consistent" with radiculopathy and that

he had a positive response to his course of Prednisone, which is "commonly prescribed" to treat radiculopathy. *Id.* at 5, 17. He does not claim that these clues— few and far between—were *only* consistent with radiculopathy or made it clear that Greyer's presentation was *inconsistent* with arthritis.

Even if it would have been reasonable under the circumstances to diagnose and treat for radiculopathy—a dubious proposition, given Greyer's failure to produce confirmatoryevidence that he actually had anything other than arthritis— that is not enough to make out a claim of deliberate indifference.

Neither does Tuell's alleged failure to reevaluate the etiology of Greyer's pain under the Wexford guidelines plausibly raise the inference that she was deliberately indifferent. First, a reevaluation is only recommended when the pain is not responsive to treatment after 90 days, WRPASOF ¶ 14, and Tuell had evidence that his pain was controlled effectively. To the extent that it wasn't, she would have known that the condition was degenerative.

Secondly, the only reasonable inference to be drawn from this failure to reevaluate is that—as she claims—Tuell truly did not suspect that Greyer suffered from another condition that would require further diagnostic testing, referral, or treatment. PRWSOF ¶¶ 70-79. As Greyer's expert explains, radiculopathy is a "very common condition," Herrington Dep. Tr. at 17, at Dkt. 166, and as Greyer himself concedes, "[i]nmates at Dixon are routinely referred off-site for advanced imaging tests such as an MRI, CT scan, or nerve conduction study." WRPSOF ¶ 9. In the absence of any evidence that Tuell had reason to be deliberately indifferent to

Greyer in particular, her claim that she never even considered sending him out for additional testing—a very common occurrence—for radiculopathy—a very common condition—plausibly suggests nothing more than negligence, even viewing the record in the light most favorable to Greyer.

And Greyer's theory does not make sense insofar as he claims that Tuell knew that he possibly suffered from another condition but refused to refer him because it was easier not to do so. If radiculopathy is a common condition, and such referrals are also common, why would Tuell and the other Wexford defendants find it easier to treat him improperly, thus prompting the dozens of appointments recounted above, rather than simply referring him to a specialist (who Greyer's expert implies would be responsible for any additional treatment, PROW at 16) if they actually suspected that their diagnosis was in error?

Nor is this a situation where the very obviousness of the risk allows one to infer knowledge of it on Tuell's part. Greyer was seen by the three Wexford defendants repeatedly, and none of them ever believed that his pain could not be accounted for by arthritis; he was also seen by another prison doctor (not a defendant in this case) who likewise did not find that Greyer obviously presented with radiculopathy or something other than arthritis. PRWSOF ¶¶ 66; *see Steele*, 82 F.3d at 178 ("The evidence further shows that two different sets of doctors also initially made the [mistaken] diagnosis. . . . This evidence was important, however, on the question whether the very obviousness of Steele's medical problem might be enough to show knowledge on Dr. Choi's part. If two sets of outside doctors could

draw the same (erroneous) conclusion, it is difficult at best to claim that another diagnosis was "obvious.").

Finally, the only harm that the expert claims Greyer suffered by the lack of additional testing was a failure to have "his candidacy for interventional pain management evaluated" which, he says, would have made it "more likely than not that Mr. Greyer's pain symptoms and source of pain would have been identified as well as appropriately and timely managed." PROW at 19-20. But under the Eighth Amendment, Greyer was not entitled to any "specific care" or the "best care possible," *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), but only "adequate, minimum-level medical care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

There is no evidence that, even if Tuell knew that it was possible Greyer suffered from radiculopathy or some other condition beyond arthritis, the care she provided to Greyer for his chronic pain fell below the standard of care for those other conditions. Although Greyer might have missed out on more effective interventions, there is no basis to conclude that the treatment he received was not adequate for his alleged radiculopathy, or for chronic pain generally—and certainly not that it amounted to deliberate indifference, even if it were below the relevant standard of care. The expert only claims that Tuell fell below the standard of care by failing to order more tests—but "whether further testing is warranted is a classic example of a matter for medical judgment," *Estelle*, 429 U.S. at 107, especially when another diagnosis is not obvious. This theory fails as well.

### 3. Mershon

#### a. Mershon's treatment of Greyer

Mershon too claims all her decisions were based on her medical judgment. PRWSOF ¶¶ 74, 79. That claim is entitled to deference unless Greyer can produce enough evidence to raise the inference that it is pretextual and that she instead possessed a culpable, reckless mental state. *Zaya*, 836 F.3d at 805.

Mershon saw Greyer eleven times. On August 15, 2018, she saw him for the first time on a referral from sick call. He complained of right hip pain not controlled by Tylenol, and she concluded that he likely suffered from arthritis and ordered an x-ray. PRWSOF ¶¶ 19-21. After an x-ray confirmed arthritis in the hip, she saw Greyer on August 23, 2018, where he complained that his naproxen was ineffective; she continued that prescription but discontinued his Tylenol prescription, replacing it with Tylenol with codeine. *Id.* ¶¶ 22-24. She saw him twice more in 2018: on September 24, he reported that his pain medications were working, *id.* ¶ 25; on October 24, he requested that she renew his Tylenol with codeine prescription. *Id.* ¶ 26.

She next saw him for a complaint of pain on February 11, 2019, and she prescribed Prednisone and referred him to a doctor to evaluate his regimen of medications and his diagnosis. Id. ¶¶ 28-33. She did not see him again until March 13, 2020, when there is no evidence that he complained of any pain; nor is there any such evidence for his appointments of August 7, 2020, or September 9, 2020. *Id.* ¶¶

56-60. His complaints reemerged at an appointment on December 2, 2020, but he denied experiencing severe pain, and Mershon represcribed naproxen. *Id.* ¶¶ 61-62.

She only saw Greyer twice more—September 5, 2021 and February 17, 2022—and there is no evidence he complained of any pain at these appointments either. *Id.* ¶¶ 68-69.

### b. Persistence in a course of treatment known to be ineffective

Greyer argues that Mershon was deliberately indifferent by her persistence in an ineffective course of treatment during the same periods as Tuell.

During the first period, from July 2019 to November 2020, he complained of continuing pain, noted that his medications were not working, and asked to be referred to an outside provider, PROW at 24-25, citing the same evidence of a grievance and a sick call slip, as well as medical records to that effect. *Id.* at 17, 23-24. Mershon saw him three times during this period— March 13, 2020; August 7, 2020; and September 9, 2020—and he complains that his medications went unchanged in the face of his complaints. *Id.* at 24-25.

During the second period, between March 2021 and August 2021, he also argues that Mershon's conduct manifested deliberate indifference. *Id.* at 25. In this period, Mershon saw him once, on September 5, 2021.

Like with Tuell, Greyer fails to show that Mershon would have known the full scope of his interactions and complaints to various prison officials. But even if she did know, Greyer still fails to show deliberate indifference. When he complained of pain, she never failed either to alter his prescription or refer him to another

30

doctor; when his medications remained unchanged, it was only because he did not complain of pain. Greyer's expert faults her for prescribing opioids without further evaluation on August 23, 2018, *id.* at 19, but does not claim that such a prescription was in itself inappropriate for treating arthritis. And insofar as Greyer's allegedly serious condition was his chronic pain, it is hard to see how prescribing "stronger" medications can constitute deliberate indifference. *Id.* at 18.

Additionally, Greyer's evidence fails to raise the inference that Mershon was deliberately indifferent for the same reasons as stated above with respect to Tuell— the degenerative nature of his condition, that he had told her that his medications were effective, that he failed to tell her that he was in pain on many occasions, that the ineffectiveness was not patent because Greyer never evinced any objective signs of being in pain, and that any arguably objective signs were confounded by Greyer's other conditions. This theory therefore fails.

### c. Choosing an easier and less efficacious course of treatment

Greyer argues that Mershon was deliberately indifferent by her choice of an easier and less efficacious course of treatment, relying, as in Tuell's case, on the expert report, her failure to abide by the guidelines, and the very obviousness of the risk that the arthritis diagnosis was wrong and that their treatment would thus fail to abate his pain. Mershon, like Tuell, says that his presentation never indicated radiculopathy or any condition beside arthritis, that further testing or referral to a specialist was never warranted, and that her decisions were all made using her medical judgment. PRWSOF ¶¶ 70-79. Again, that claim is entitled to deference

31

unless Greyer can make a strong showing to the contrary. His arguments fail for the same reasons as they do with respect to Tuell.

Greyer adds two pieces of evidence specific to Mershon. First, he argues that she has given direct evidence of her consciousness of a risk that her diagnosis was in error, citing her deposition testimony that Greyer's complaints of severe pain "did not correlate with [his] osteoarthritis diagnosis." WRPSOF ¶ 7; PROW at 17. But this alleged admission—that "his diagnosis doesn't match up with what he's claiming his pain is," Mershon Dep. Tr. Exhibit B at 35, at Dkt. 164—constitutes only an acknowledgement that "his exam, his behavior, and his x-ray" all indicated that "[t]his is a patient that has osteoarthritic pain," and yet Greyer continued to claim that his pain was "severe." *Id.* In context, then, she is describing her *disbelief* that Greyer had any condition other than arthritis. Even if it would have been reasonable to draw the inference that there was a risk that he suffered from another condition, nothing that Greyer has produced allows the Court to conclude that she actually drew that inference subjectively. And even if she had so concluded, Mershon's response—referring him to a doctor to see if there was "something [she was] missing," *id.*—hardly amounts to deliberate indifference.

Secondly, he points to the fact that during the December 2, 2020 visit, he reported to Mershon that he spent much of his time lying in bed. His expert says this is evidence of decreased functionality, which should have indicated the presence of another condition. PROW at 10. But as defendants argue, IDOC restricted prisoner movement to combat the spread of COVID-19 then, forcing him

32

to spend much of his time in his cell. PRWSOF ¶¶ 61-62. Thus, even considered in the context of Greyer's other alleged clues, no reasonable jury could conclude that this evidence would have raised the inference in her mind that he suffered from decreased functionality, and thus another condition. Further, Greyer does not show that spending more time lying in bed as a consequence of a painful hip or "decreased functionality" are inconsistent with arthritis, so he runs into the same difficulty as above. Greyer has thus failed to show deliberate indifference on this theory.

### 4. Lank

#### a. Lank's treatment of Greyer

Lank claims all her decisions were based on her medical judgment. PRWSOF ¶¶ 74, 79. That claim is entitled to deference unless Greyer can produce enough evidence to raise the inference that it is pretextual and that she instead possessed a culpable, reckless mental state. *Zaya*, 836 F.3d at 805.

Lank saw Greyer four times. At the first appointment on February 21, 2019, he reported, for the first time, pain in his shoulder and right arm in addition to his hip, and that his Tylenol with codeine was not effective. She concluded that his neck and shoulder were likely strained, and that he had arthritis in his right hip. She ordered an x-ray to confirm these diagnoses, discontinued his Tylenol with codeine, and prescribed Tramadol, another opioid, along with Mobic and Robaxin. *Id.* ¶¶ 34-36. At his next appointment on March 7, 2019, they discussed the results of Greyer's x-rays, which showed some arthritis in his neck. He continued to report

33

right hip and leg pain, and also complained of hearing voices that told him to kill himself to stop the pain. In response, she referred him to a mental health nurse practitioner, prescribed an egg crate mattress, Vitamin D3, muscle rub, ice, and hot packs. *Id.* ¶¶ 37-39. During his next appointment a week later, on March 15, 2019, Greyer reported that his chronic pain was worse with movement in his right arm, neck, and shoulder, but did not complain of any hip pain, and his medications were continued. *Id.* ¶¶ 40-42. Finally, on April 5, 2019, he again complained of neck and shoulder pain, but not hip pain. Lank prescribed Voltaren and planned to restart his Tramadol and Robaxin while discontinuing his ibuprofen and naproxen. *Id.* ¶¶ 46-48.

### b. Persisting in an ineffective course of treatment

Greyer's argument that Lank was deliberately indifferent under this theory seems to be limited to the claim that on April 5, 2019, he complained of continuing pain—although not in his hip—and she restarted him on the same medications he was "previously prescribed"—namely Voltaren, Tramadol, and Robaxin. PROW at 24.

As a preliminary matter, while he had previously been prescribed NSAIDs, he had not been prescribed Voltaren, a stronger NSAID than he had yet taken. The only evidence Greyer produces in support of the inference that Lank knew of the risk her chosen course would be ineffective is the expert's claim that the standard of care demanded further testing—but not that this combination of pain medications was inappropriate to treat Greyer's only complaint at this appointment, his

34

arthritic neck pain (which had been objectively confirmed by an x-ray). And insofar as Lank deviated from the standard of care by prescribing opioids without further evaluation, that error is at best mere malpractice, and cannot constitute deliberate indifference as to pain. This theory therefore fails.

### c. Choosing an easier and less efficacious course of treatment

Greyer argues that Lank was indifferent under this theory using the same evidence as to Mershon and Tuell—which also fails to raise the plausible inference of deliberate indifference in Lank's case—but adds Lank's deposition testimony that a patient's subjective complaints are no less important than her objective findings, and that if an inmate presented with general pain complaints for which she could not find an answer, she would probably conduct further testing before considering an outside referral. WRPSOF ¶ 18.

The defendants point out that she elaborated, saying that objective findings are more useful in treating a patient with purely subjective complaints, as a patient's evaluation of their pain is not especially probative. Lank Dep. Tr. Exhibit D at 21, at Dkt. 165. Regardless, alone or in conjunction with the other pieces of evidence, at best this shows that she was negligent with respect to Greyer. Indeed, the only plausible inference that can be drawn from it is that, even in the face of evidence to the contrary, she believed that she had found the answer to Greyer's pain—that is, she had not subjectively drawn the inference that Greyer suffered from another condition. Thus, this theory fails.

### 5. Wexford

Greyer also brings a claim against Wexford Health Sources, which contracts with IDOC to provide medical care in Illinois prisons. WRPASOF ¶¶ 11-12. He alleges Wexford maintained a policy that caused a violation of his rights under the Eighth Amendment. Because he has failed to establish any such violation, among other reasons, this claim fails.

### a. Elements of a Monell claim

In *Monell*, the Supreme Court held that when agents of a local government infringe federal rights because of that government's "policy or custom", the government "as an entity" can be held responsible under § 1983. *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978). The Seventh Circuit treats private corporations acting under color of state law as if they were municipalities for purposes of § 1983 liability. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

To make out a *Monell* claim, a plaintiff must satisfy three prongs. First, the plaintiff must show (1) an underlying deprivation of a federal right that is traceable to some municipal action, including an "express policy that causes a constitutional deprivation when enforced." *Id.* This policy must demonstrate (2) municipal fault, which, in the case of an alleged Eighth Amendment violation, is deliberate indifference. *Id.* If the policy is not facially unconstitutional, the plaintiff must show that it was "obvious" that the policy would lead to constitutional violations, yet that risk was "consciously disregarded." *Id.* A plaintiff must finally show that the municipal action was (3) the "moving force" behind the alleged constitutional

36

violation, thereby establishing a direct causal link between the challenged municipal action and the violation of the plaintiff's constitutional rights. *Id.*

### b. *Greyer's claims*

Greyer argues that two Wexford policies give rise to *Monell* liability: (1) the Pain Management Policy and (2) IDOC directives regarding chronic care clinics at Dixon. As to the former, he argues that because Dr. Lank "recalled using this Policy to treat inmates at Dixon and testified that it would have been part of her normal practice to use" it, it is "entirely plausible that this Policy is the moving force" behind the alleged Eighth Amendment violations. PROW at 29. As to the latter, he argues that the lack of a chronic pain clinic led to an "utter failure to provide specialty care" for his chronic pain. *Id.* at 30. Both claims fail all three prongs of *Monell.*

### c. *Pain management guidelines*

As discussed above, Greyer has failed to establish any underlying claim of constitutionally defective care by the individual Wexford defendants. It is also doubtful that the guidelines represent a policy for purposes of *Monell.* The defendants urge that the guidelines are not binding and do not supplant a medical provider's judgment, PRWSOF ¶ 9, so any alleged violations are attributable solely to the providers and not to Wexford.

Even if the guidelines constituted a policy, Greyer has offered no evidence that they were unconstitutional as applied to him, let alone facially unconstitutional—indeed, the only time he addresses the guidelines with

particularity is to raise them as a sword against the individual Wexford defendants, arguing that they fell below the standard of care by their failure to reevaluate the etiology of his pain as the guidelines recommended. PROW at 18. This hardly suggests that it was obvious they would lead to constitutional violations.

Finally, he fails to make any showing as to causation. His only evidence that the guidelines impacted his care at all is Lank's statement that she sometimes uses the guidelines, but not necessarily in Greyer's case. WRPSOF ¶ 15. That does not demonstrate that his care would have been improved, or even different at all, had the individual Wexford defendants not relied on the guidelines, assuming they did.

### d. Chronic pain clinics

Again, in the absence of any underlying constitutional violations, Greyer's claim related to the absence of pain clinics must fail. It also fails because he has not shown that the absence of such a clinic is a policy choice on Wexford's part, as the existence and scope of chronic clinics is determined by IDOC. See PRWSOF ¶¶ 7-8.

Even if it were a Wexford policy to intentionally forego the creation of a chronic pain clinic, Greyer's only evidence that this decision is unconstitutional is his expert's opinion that they "remove the onus from the inmate of having to arrange for a follow-up visit," making them an "effective tool for clinic organization" to ensure that patients don't "fall[] through the cracks." PROW at 30.

Even if the existence of such clinics were *more* effective for the treatment of chronic pain, Greyer fails to demonstrate that the effectiveness of the present clinics is constitutionally defective, or that Wexford was deliberately indifferent to the

38

possibility that the lack of chronic pain clinics would produce constitutionally defective care. Neither does he demonstrate that a chronic pain clinic would have improved or altered his care in any way as compared to the non-specific chronic clinics at which he was seen. He thus also fails to demonstrate that this policy was the moving force behind any alleged Eighth Amendment violations.

*     *     *

The Wexford defendants' motion for summary judgment is granted.

## E. IDOC defendants' alleged deliberate indifference

Greyer also brings claims of deliberate indifference against two employees of IDOC: nurse Elizabeth White and Dixon's Health Care Unit administrator Amber Allen. Because no reasonable jury could find in his favor on these claims, summary judgment is granted.

### 1. White

#### a. White's treatment of Greyer

White saw Greyer twice. First, on March 25, 2019, White saw Greyer at sick call, his third visit there that month. IRPASOF ¶ 25, at Dkt. 193. He complained of severe pain in his right shoulder, arm, and neck (but not his hip). Id. ¶ 23. She observed no visible signs of discomfort, prescribed Tylenol under the applicable IDOC policy and told him to return if his symptoms worsened, but did not refer him to a physician. Greyer claims that he disagreed with this decision not to refer him, which is allegedly against IDOC policy. Id. ¶ 23-25. On March 27, 2019, Greyer

returned to sick call with the same complaints as March 25. Id. ¶ 26. White told him to finish his Tylenol regimen before returning to sick call—again, she claims he agreed to this plan, while he says he did not and insisted that he be referred to a doctor, which White refused to do. Id. ¶ 26.

### b. Choosing an easier and less efficacious course of treatment

Greyer's theory of White's deliberate indifference by an easier and less efficacious course of treatment is this: because she had access to his medical records, she ought to have known that "oral medications were ineffective at treating his pain." PROW at 20. This supposition would have been confirmed when Greyer returned on March 27 still complaining of pain; and because White admits that Tylenol does not take more than two days to become effective, she would have known that her chosen course of treatment was ineffective, yet she did not alter it. PROW at 21.

First, Greyer fails to show any evidence that she knew that a course of Tylenol would be ineffective other than to gesture generally at his medical records. PROW at 20. Even if she had examined them in their entirety, she would have found ample evidence that Greyer's complaints about pain had subsided while on "oral medications." There is nothing in the record suggesting her actions fell below the relevant standard of care or were medically inappropriate such that deliberate indifference could be inferred.

Second, even if she appreciated a risk that prescribing Tylenol would not abate Greyer's pain, he still fails to demonstrate that her response amounted to

deliberate indifference. As a nurse, her authority and discretion are limited. She may provide only "basic care," which, at the most, involves dispensing "over-the-counter pain and cold pills." PRISOF ¶ 21. Greyer does not demonstrate that she knew another over-the-counter medication would be more effective yet refused to prescribe it (or how her chosen course was easier). And to the extent that his pain could not be dealt with by over-the-counter medications, White cannot be held responsible, because prescribing stronger medication was not within her remit. "Public officials do not have a free-floating obligation to put things to rights, disregarding rules . . . along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job." *Burks*, 555 F.3d at 595. This theory of deliberate indifference therefore fails.

### c. Delay in medical treatment

Although White could not have prescribed stronger medication, Greyer also argues that she was deliberately indifferent by failing to refer him to someone who could, thus delaying his treatment and unnecessarily inflicting pain. PROW at 22. He argues that IDOC policy requires that a sick call nurse refer a patient to a physician if they come to sick call more than twice with the same complaint in one month, IRPASOF ¶ 24, and White's failure to do so amounted to deliberate indifference. PROW at 22-23. The parties dispute whether Greyer agreed to defer a physician referral until he finished the course of Tylenol that White had prescribed. But that is not material to the analysis, because even assuming he had disagreed, he still cannot show that White's conduct produced any harm.

41

"While published requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm." *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (quoting *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005)). Even if White's failure to comply with IDOC policy allows one to infer that she was cognizant that she was creating a serious risk of harm in not immediately making a referral—which is dubious, in light of medical records showing that he had seen nurse practitioners and doctors for the same complaints several times earlier in the month—Greyer's claim still fails.

When a claim of deliberate indifference is based on a delay in treatment, the plaintiff must produce some "verifying medical evidence" that the delay (rather than the inmate's underlying condition) caused some degree of harm. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013). Additionally, a plaintiff must show that the defendant's inaction "caused the delay in his treatment." *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005). Even crediting Greyer's claim that he continued to suffer pain after she refused to refer him to a doctor, he does not produce any evidence that White's refusal led him to see a doctor less quickly than he eventually did. In the absence of such a showing, Greyer cannot demonstrate that White's actions were the cause of his pain in the interim, and his claim fails.

## 2. Allen

Greyer argues that Allen was deliberately indifferent by her response to his grievances about his medical care. He claims that there is a genuine dispute of

42

material fact as to whether Allen's job duties involve responding to prisoner grievances, PROW at 26; if they do, he continues, she personally participated in the resolution of his grievance, and because she had sufficient knowledge that his care was constitutionally deficient, her subsequent failure to properly investigate or refer his complaints to the medical staff therefore constitutes deliberate indifference. PROW at 27-28.

He relies on the March 27, 2019 and July 25, 2019 grievances and their respective responses, which he says demonstrate both that she knew about his complaints and that she was deliberately indifferent by failing to respond appropriately. *Id.* Because there was no underlying violation of the Eighth Amendment, however, Greyer's claim fails.

Even if there had been such a violation, the record does not indicate that Allen was required to investigate grievances or inform the medical staff of any concerns that emerged from such an investigation. Greyer points to sections of the grievance responses that incorporate information Allen provided to the grievance officer to aid him in his decision about the merits of the grievance. PROW at 27. But this does not show that she had any personal involvement in the outcome of the grievance process or a responsibility to inform the medical staff of the complaint.

And whatever her responsibilities, her actions did not amount to deliberate indifference. She investigated the complaints when the grievance officer inquired into Greyer's medical care (certainly not "shredd[ing] [them] without reading" them or "interven[ing] to prevent the medical unit from delivering needed care," *see*

43

*Burks,* 555 F.3d at 595), and found that Dr. Lank had treated him and prescribed medication for his pain. Greyer Decl. Ex. 2 at 11; Ex. 4 at 15, at Dkt. 177. She was then entitled to "reasonably defer to the judgment of [the] medical professional." *Giles v. Godinez*, 914 F.3d 1040, 1049-1050 (7th Cir. 2019). Because Greyer has not shown that his grievances were ignored, or that Allen's reliance was unreasonable, his claim fails.

*    *    *

The IDOC defendants' motion for summary judgment is granted.

## F. Jeffreys and Wilks

Rob Jeffreys, the former director of IDOC, and Justin Wilks, a former warden at Dixon, remain defendants in this action in their official capacities.[9] Although they did not file a motion for summary judgment, they too are terminated as defendants.

The only claims pending against Jeffreys and Wilks are Counts I and X of the Second Amended Complaint, which allege deliberate indifference under § 1983. Dkt. 59 at 17, 24. After Greyer's release from prison on September 16, 2022, the parties stipulated that Greyer's request for injunctive relief would be dismissed, as it had been made moot. Dkt. 157. So the relief sought under these claims is necessarily for damages.

---

[9] Neither Jeffreys nor Wilks appear to continue in these offices. Under Fed. R. Civ. P. 25(d), when a public officer sued in his official capacity ceases to hold his office, his successor is automatically substituted as a party. Regardless of who currently holds these offices, these claims are dismissed for the same reasons.

A suit against an official in his official capacity for damages, is, in effect, a suit against the entity by which he holds the office, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)—in this case, IDOC, a state agency. But state agencies like IDOC are arms of the state, entitled to sovereign immunity under the Eleventh Amendment to the same extent as the state itself. *See Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005); *Taylor v. Stateville Dep't of Corr.*, No. 10 C 3700, 2010 U.S. Dist. LEXIS 127378, at *7 (N.D. Ill. Dec. 1, 2010). And absent waiver or congressional override, the Eleventh Amendment prohibits suits against states for damages. *Graham*, 473 U.S. at 169.

Finally, because sovereign immunity is a jurisdictional bar, the Court may raise it *sua sponte. Crosetto v. State Bar of Wis.*, 12 F.3d 1396, 1402 n.10 (7th Cir. 1993).

Therefore, because any remaining claims against Jeffreys and Wilks are for damages—claims which are prohibited by the Eleventh Amendment—the Court dismisses those claims and terminates Jeffreys and Wilks as defendants.

## IV. CONCLUSION

Because no reasonable jury could find for Greyer on his claims against either the Wexford defendants or the IDOC defendants, their motions for summary judgment are granted. And because any remaining claims against defendants Jeffreys and Wilks are barred by the Eleventh Amendment, those claims too must be dismissed. This case is dismissed with prejudice.

Date: October 17, 2023

Honorable Iain D. Johnston
United States District Judge